IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Gregory Michael Cooley, | ) | C/A No.: 1:14-1158-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a

Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)

(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two

issues before the court are whether the Commissioner's findings of fact are supported by

substantial evidence and whether she applied the proper legal standards. For the reasons

that follow, the undersigned recommends that the Commissioner's decision be reversed

and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On February 1, 2008, Plaintiff filed an application for DIB in which he alleged his

disability began on December 6, 2006. Tr. at 165–67. His application was denied initially

and upon reconsideration. Tr. at 139–40, 143–44. On April 14, 2010, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Ivar E. Avots. Tr. at 38–80 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 28, 2010, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 112–25. The Appeals Council remanded the claim to the ALJ in an order dated June 21, 2012. Tr. at 131–35. Plaintiff appeared at a second hearing before the ALJ on November 2, 2012. Tr. at 1–37 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 11, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 88–106. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 81–86. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 27, 2014. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 47 years old at the time of the first hearing and 49 years old at the time of the second hearing. Tr. at 44. He completed the tenth grade and later obtained a high school equivalency certificate ("GED"). Tr. at 45. His past relevant work ("PRW") was as an automotive assembler and a window cleaner. Tr. at 72–73. He alleges he has been unable to work since December 6, 2006. Tr. at 165.

2.     Medical History

On November 3, 2003, Plaintiff reported to Paul Kellett, M.D. ("Dr. Kellett"), complaining of a pain in his left upper extremity, particularly with range of motion ("ROM") of his shoulder. Tr. at 295. Dr. Kellett indicated Plaintiff's pain was caused by

repetitive use of his left arm. *Id.* On November 14, 2003, Dr. Kellett observed tenderness in Plaintiff's posterolateral shoulder, lateral triceps, bicipital groove, left olecranon, and dorsal and ventral wrist. Tr. at 299. Plaintiff complained of lateral elbow and wrist pain and had slightly decreased grip strength in his left hand. *Id.* On November 19, 2003, Plaintiff had tenderness in his anterior and posterior shoulder and pain with any ROM greater than 30 degrees. Tr. at 302. Dr. Kellett administered an injection to Plaintiff's left elbow. *Id.* On November 21, 2003, Plaintiff complained of significant left shoulder pain and reported that the injection had not decreased his elbow pain. Tr. at 304. Dr. Kellett indicated Plaintiff should do no lifting, pushing, or pulling over 10 pounds, twisting, or work above mid-chest level with his left arm. *Id.*

On December 10, 2003, an MRI of Plaintiff's left shoulder indicated moderate hypertrophic tendinosis involving the distal one-and-a-half centimeters of the supraspinatus tendon without a full-thickness tear. Tr. at 280.

Dr. Kellett referred Plaintiff to Kevin W. Kopera, M.D. ("Dr. Kopera"), for a second opinion. Tr. at 306. On December 23, 2003, Dr. Kopera examined Plaintiff and was puzzled at his symptoms. Tr. at 306. Dr. Kopera recommended an MRI of Plaintiff's left elbow. *Id.*

Plaintiff's MRI indicated increased signal of the ulnar nerve as it passed posterior to the medial epicondyle. Tr. at 281. The radiologist, Jeffrey K. Shramek, M.D. ("Dr. Shramek"), noted this to be a non-specific finding, but stated that it raised the possibility of ulnar neuropathy when considered with evidence of perineural inflammation or edema along the posteromedial aspect of the elbow extending into the subcutaneous fat. *Id.* Dr.

Shramek also observed a small posterior medial epicondylar spur and indicated an impression of mild common extensor origin tendinopathy or lateral epicondylitis. *Id.*

Plaintiff followed up with Dr. Kopera the next day. Tr. at 311. Dr. Kopera recommended nerve conduction studies ("NCS"). *Id.* The NCS were negative for left ulnar neuropathy, but indicated left carpal tunnel syndrome ("CTS"). Tr. at 313. Dr. Kopera authorized Plaintiff to return to regular work duties on January 23, 2004. Tr. at 315.

Plaintiff underwent a neurological evaluation of his left upper extremity with L. Breeden Hollis, Jr., M.D. ("Dr. Hollis"), on March 9, 2004. Tr. at 282–84. Plaintiff had slightly weakened grip in his left hand and slight weakness in his triceps. Tr. at 284. Plaintiff had no atrophy in his left hand muscles. *Id.* He had altered sensation in his left hand, most acute in the hypothenar area. *Id.* He had positive Tinel's sign at the left medial elbow. *Id.* Dr. Hollis diagnosed left ulnar neuropathy, primarily irritative, and prescribed Neurontin. *Id.*

Plaintiff underwent NCS on his left upper extremity on March 26, 2004. Tr. at 286. Plaintiff demonstrated evidence of mild median nerve mononeuropathy at the wrist (CTS), but no evidence of a diffuse peripheral neuropathic process or isolated ulnar nerve dysfunction. *Id.*

On April 1, 2004, Dr. Hollis indicated Plaintiff could perform "a light duty job that does not exacerbate arm pain/tingling on new medication" and estimated Plaintiff would remain on light duty for several weeks. Tr. at 289. Plaintiff followed up with Dr. Hollis on April 8, 2004. Tr. at 290–91. Dr. Hollis indicated NCS were normal except for

4

left CTS that was playing no significant role in Plaintiff's symptoms. *Id.* He indicated he could do no more to assist Plaintiff and recommended Plaintiff consult an upper extremity surgeon for an opinion and a pain management physician. Tr. at 291.

Plaintiff presented to Timothy R. Brown, M.D. ("Dr. Brown"), on April 15, 2004. Tr. at 324. Plaintiff's examination was normal except for some tenderness. *Id.* Dr. Brown indicated he would review the MRIs and records from Drs. Kellett and Kopera before seeing Plaintiff again. *Id.* On June 15, 2004, Dr. Brown indicated the majority of Plaintiff's pain was in the central distal triceps. Tr. at 325. He administered an injection and continued Plaintiff on light duty with no pushing or pulling more than 10 pounds with the left upper extremity. *Id.* On July 15, 2004, Plaintiff complained to Dr. Brown that the injection and his medications provided no relief. Tr. at 330. Dr. Brown recommended six treatments of ultrasound to the triceps insertion and continued Plaintiff's prior restrictions. *Id.* Plaintiff returned to Dr. Brown on September 16, 2004, and reported no relief from the ultrasound therapy. Tr. at 335. Dr. Brown indicated he could provide no further options for Plaintiff, stated Plaintiff had reached maximum medical improvement and had a three percent impairment to his left arm, and imposed no permanent restrictions. *Id.*

On July 21, 2006, Plaintiff presented to D. Scott Grubbs, M.D. ("Dr. Grubbs"), for right shoulder and upper extremity pain and weakness. Tr. at 379. He indicated he had injured his shoulder while pushing on inserts for headrests at work and complained of pain in his posterior arm, medial elbow, and between the long and ring fingers of his right hand. *Id.* Plaintiff had full ROM of his neck, but discomfort on Spurling's maneuver

bilaterally, right more than left. *Id.* He was tender over the trapezius, supraspinatus, intraspinatus, lateral deltoid, subacromial region, biceps, acromioclavicular region, and medial epicondyle. *Id.* He had good ROM of his right shoulder, but complained of discomfort on abduction. *Id.* He had limited internal rotation with forward flexion. *Id.* Dr. Grubbs indicated an impression of right shoulder and right upper extremity pain related to overuse and symptoms of CTS without classic presentation. Tr. at 380. Dr. Grubbs restricted repetitive use of Plaintiff's right arm and hand and indicated he should not engage in any significant physical activity without a splint. Tr. at 383.

Plaintiff followed up with Dr. Grubbs on July 26, 2006. Tr. at 384. Plaintiff had painful ROM and tenderness in his neck and right upper extremity. *Id.* X-rays showed mild arthritis in Plaintiff's cervical spine, but no problems in his right shoulder. Tr. at 385, 377. Dr. Grubbs referred Plaintiff to an orthopedist and continued the restrictions imposed during the prior visit. Tr. at 385.

On August 8, 2006, Plaintiff presented to John H. Paylor, M.D. ("Dr. Paylor"). Tr. at 349. Plaintiff had tenderness to palpation of the superior aspect of the right shoulder and trapezius and complained of painful ROM in his shoulder and neck. *Id.* Dr. Paylor noted numbness over Plaintiff's whole hand. *Id.* He diagnosed likely right shoulder impingement, ordered an MRI, and instructed Plaintiff to remain on light duty. *Id.* The MRI indicated mild tendinosis of Plaintiff's right rotator cuff, but no tear. Tr. at 394. On August 21, 2006, Dr. Paylor noted Plaintiff continued to have problems with his shoulder. Tr. at 354. He ordered physical therapy, prescribed pain medication and an anti-

inflammatory drug, and instructed Plaintiff to remain out of work for two more days and to return to light duty. *Id.*

Plaintiff presented to Dr. Paylor on August 31, 2006, with pain in his right upper back and right lower neck and numbness in his right hand. Tr. at 360. Dr. Paylor noted physical therapy was not beneficial. *Id.* He instructed Plaintiff to continue light duty at work and to consult with Jennifer P. Martin, M.D. ("Dr. Martin"). *Id.*

Plaintiff presented to Dr. Martin for evaluation on September 13, 2006. Tr. at 366. He had 5/5 strength in his bilateral upper extremities and demonstrated diffuse tenderness to palpation over his entire cervical, thoracic, and lumbar spine and right paraspinals over his whole back. *Id.* He had significant tenderness to palpation over his right trapezius and scapula. *Id.* Plaintiff's right neck pain was reproducible through bilateral cervical facet load. *Id.* He had pain with cervical flexion and extension and decreased sensation to light touch below the elbow of his right arm and into his right hand. *Id.* Plaintiff had normal gait and reflexes. *Id.* Dr. Martin indicated Plaintiff's exam seemed consistent with possible cervical facet arthropathy/spondylosis and a myofascial pain component. *Id.* She prescribed medications, instructed Plaintiff to obtain an MRI of his cervical spine, and continued his work restrictions. *Id.*

An MRI revealed a remote mild compression fracture to the superior endplate at C7-T1 and degenerative spondylosis, most pronounced at C4-5, where the disc and osteophytes (mostly osteophytes) extended into the spinal canal and posteriorly displaced and mildly compressed the spinal cord to the left of midline, resulting in severe bilateral

bony foraminal stenosis worse on the right than the left. Tr. at 397. It also indicated a probable benign subcutaneous lipoma at the base of Plaintiff's neck. *Id.*

Plaintiff followed up with Dr. Martin regarding the MRI findings on September 19, 2006. Tr. at 370. Dr. Martin indicated the damage to Plaintiff's cervical spine appeared mostly spondylotic in nature and that his acute pain may be related to overuse aggravating chronic changes or to a new injury. *Id.* She suggested Plaintiff had a significant myofascial component to his pain. *Id.* Dr. Martin continued Plaintiff's work restrictions and referred him to a pain management clinic. *Id.*

Plaintiff presented for Rebecca S. Holdren, M.D. ("Dr. Holdren"), for an initial pain management consultation on November 6, 2006. Tr. at 416–19. He complained of continuous, aching pain in his right shoulder, back, and arms. Tr. at 416. Dr. Holdren observed moderate tenderness and decreased ROM in Plaintiff's right shoulder. Tr. at 418. Spurling's test was positive on the right. *Id.* Plaintiff's motor function was 4+/5 in his proximal right upper extremity. *Id.* He had decreased sensory perception in the right C7-8 distribution. *Id.* His gait was antalgic. *Id.* Dr. Holdren referred Plaintiff for NCS. Tr. at 418. She restricted Plaintiff to light duty, to include no lifting greater than 25 pounds, no repetitive bending or lifting, and assembling only 50 parts per day. Tr. at 419.

On November 22, 2006, Dr. Holdren administered NCS and electromyogram ("EMG") to Plaintiff's right upper extremity that revealed moderate-to-severe right CTS and moderate left CTS. Tr. at 420–21.

Plaintiff followed up with Dr. Holdren on December 4, 2006. Tr. at 422. He complained of sleep disturbance and indicated his medications were ineffective. *Id.* Dr.

8

Holdren recommended a right cervical trigger point injection and prescribed Lyrica. Tr. at 423–24. Plaintiff received a shoulder injection on December 19, 2006. Tr. at 429.

On January 8, 2007, Plaintiff indicated he obtained little relief from Lyrica. Tr. at 430. Dr. Holdren prescribed bilateral resting neutral carpal tunnel splints and instructed Plaintiff to remain out of work. Tr. at 433.

On January 22, 2007, Plaintiff underwent a vocational and rehabilitation evaluation with Dr. William W. Stewart, CRC, CVE, LCP ("Dr. Stewart"). Tr. at 598–607. Dr. Stewart administered the Wide Range Achievement Test-Revised 4 (WRAT-R4), and Plaintiff scored at the 8.1 grade level (fourteenth percentile) for reading and at the 6.9 grade level (nineteenth percentile) for math. *Id.* Dr. Stewart indicated Plaintiff's scores were "descriptive of a worker who would only be qualified for manual/physical jobs." Tr. at 603. Dr. Stewart administered the Penn Bi-Manual Dexterity Worksample, and Plaintiff's times and scores were below the second percentile and "reflective of slow work speed and pace and descriptive of a worker with no ability to successfully compete for, perform, and sustain sedentary and light jobs that require a fast paced/production rate work speed." *Id.* Plaintiff's scores on the Beck Depression Inventory-II ("BDI-II") and Beck Anxiety Inventory ("BAI") indicated severe depression and anxiety. Tr. at 604. His score of the Life Situation Survey ("LSS") suggested Plaintiff had a poor quality of life. *Id.* Dr. Stewart indicated Plaintiff needed professional counseling and psychiatric evaluation and care. *Id.* Dr. Stewart opined that "without significant improvement in his overall condition or conditions (which the medical evidence indicates in [sic] not likely), Mr. Cooley's prognosis for successful vocational rehabilitation to some kind of

sedentary/light work or job is quite poor; that is, most likely he will remain unable to work and vocationally disabled because of these injuries and ongoing problems and limitations." Tr. at 606.

Plaintiff returned to Dr. Holdren for follow up on February 5, 2007, and reported worsened pain. Tr. at 434. Plaintiff indicated he had recently been treated for pneumonia. *Id.* Dr. Holdren described Plaintiff as having acute pain and tenderness in his cervical spine musculature and right shoulder. Tr. at 436. He had decreased scapulothoracic gliding, positive Spurling's test, slightly irritable mood, 4+/5 motor functioning, decreased sensation in the C7-8 distribution, and antalgic gait. *Id.* She diagnosed uncontrolled CTS, shoulder joint pain, cervical spondylosis, cervicalgia, and rotator cuff disorder. *Id.* Dr. Holdren noted psychiatric treatment was not approved by the workers' compensation carrier, but was medically necessary. *Id.* She prescribed Cymbalta for depression and instructed Plaintiff to perform light duty with no overhead work. *Id.*

On March 5, 2007, Plaintiff reported that Cymbalta made him feel better, but did not take his pain away. Tr. at 438. Lisa D. Spears, ANP ("Ms. Spears"), observed positive fibromyalgia tender points and positive straight-leg raise test. Tr. at 440. She prescribed Methadone and Lortab and instructed Plaintiff to remain out of work. *Id.*

Plaintiff presented to J. Samuel Seastrunk, M.D., P.A., for an orthopedic consultation on April 17, 2007. Tr. at 608–15. Dr. Seastrunk measured both of Plaintiff's upper arms to be the same size. Tr. at 613. His right forearm was a half centimeter larger in circumference in than his left. *Id.* Plaintiff was tender over his right trapezius and paraspinous muscles. *Id.* He had bilateral positive Tinel's at the wrist and strongly

positive Phalen's with immediate numbness in the fingers of both hands. *Id.* His right shoulder flexion and abduction were decreased to 110 degrees, but his internal and external rotation were normal. *Id.* His left shoulder abduction was reduced to 122 degrees and flexion was reduced to 135 degrees, but he had normal internal and external rotation. *Id.* Plaintiff had decreased ROM of his neck. *Id.* His average grip strength represented a strength loss of 43 percent on the right and 36 percent on the left. *Id.*, Tr. at 614. Plaintiff had no atrophy to his upper or lower extremities. Tr. at 614. Dr. Seastrunk indicated diagnostic impressions of degenerative spondylosis most pronounced at C4-5 with severe foraminal stenosis worse on the right; subcutaneous lipoma; remote mild compression fracture to the superior endplate at C7-T1; left elbow epicondylitis and left shoulder impingement syndrome with decreased functional ROM; left CTS with weakened grip strength; right shoulder impingement syndrome with functionally decreased ROM; and right CTS with weakened grip strength. Tr. at 613. Dr. Seastrunk assessed an eight percent impairment rating to Plaintiff's right upper extremity that converted to a five percent whole person impairment related to the decreased range of motion of his right shoulder; a six percent impairment rating to Plaintiff's left upper extremity that converted to a three percent whole person impairment related to the ROM deficit in Plaintiff's left shoulder; an eight percent whole person impairment rating related to the restricted ROM of Plaintiff's cervical spine; and a 10 percent impairment ratings to each of Plaintiff's upper extremities related to CTS that converted to a six percent impairment rating to the whole person related to the CTS. Tr. at 614. Dr. Seastrunk combined the impairments and indicated Plaintiff had a 25 percent whole person impairment related to his bilateral upper

extremities and cervical spine. *Id.* He indicated Plaintiff needed additional treatment for depression and CTS. Tr. at 615. He stated Plaintiff was "restricted relative to overhead work above shoulder level on a permanent basis." *Id.* Dr. Seastrunk further stated "this gentleman is totally disabled in so far as employment so long as he is taking narcotics on a daily basis." *Id.*

On July 30, 2007, Plaintiff complained to Dr. Holdren of severe pain in his bilateral hands—particularly in his left hand and forearm. Tr. at 463. He reported emotional improvement without Cymbalta. *Id.* Plaintiff presented to Lee Acres, NP ("Ms. Acres"), in Dr. Holdren's office for follow up on August 27, 2007. Tr. at 466. Plaintiff reported doing okay on his current medication regimen, but feeling sleepy and getting little improvement. *Id.* Ms. Acres indicated Plaintiff should remain out of work until after his next visit. *Id.*

Plaintiff underwent a psychiatric evaluation with Geera Desai, M.D. ("Dr. Desai"), on September 13, 2007. Tr. at 443–45. Plaintiff reported mood swings, depression, paranoia, and lack of motivation and control. Tr. at 443. He complained of severe pain and an inability to sleep for more than three hours nightly. *Id.* He denied appetite disturbance and endorsed weight gain. *Id.* Dr. Desai described Plaintiff as being "quite uncomfortable" and "quite fidgety." Tr. at 444. She noted Plaintiff "had to walk around several times because he says he just cannot sit in one place because of this pain in his shoulder that affects his whole body." *Id.* Dr. Desai observed Plaintiff to be depressed, somatic, vaguely suicidal, and to have obvious psychomotor retardation. *Id.* She indicated his speech was coherent and relevant, his memory was adequate, and he had no problem

with serial sevens. *Id.* Dr. Desai assessed major depressive disorder, not otherwise specified ("NOS"), chronic right shoulder pain, and bilateral hand weakness. Tr. at 445. She recommended Plaintiff be prescribed an antidepressant medication. *Id.*

On September 25, 2007, Plaintiff reported increased pain after working in his yard. Tr. at 469. He indicated the psychiatrist had recommended a stronger antidepressant. *Id.* Plaintiff's examination remained unchanged Tr. at 471. Ms. Acres increased Plaintiff's Cymbalta dosage and instructed him to follow up in four to six weeks. Tr. at 474. On October 25, 2007, Plaintiff reported constant pain, more stiffness and numbness in his hands, and increased headaches on the higher dosage of Cymbalta. Tr. at 476. Ms. Spears instructed Plaintiff to taper off Cymbalta and start Effexor. Tr. at 478. On November 21, 2007, Plaintiff reported increased irritability and complained of pain radiating from the right side of his neck to his shoulder and down his right arm that was not controlled by his medications. Tr. at 480. Ms. Spears discontinued Effexor and prescribed Paxil. Tr. at 483. On December 19, 2007, Plaintiff's physical examination indicated the same findings as in previous months. Tr. at 486. Dr. Holdren prescribed Kepromax, changed Methadone from every 12 hours to every night at bedtime, and increased Lortab from up to twice daily to up to three times daily. Tr. at 487. On January 21, 2008, Plaintiff informed Ms. Acres that he was doing well on his current pain regimen and sleeping well. Tr. at 488.

On February 19, 2008, Plaintiff presented to Dr. Koch with left leg pain and Dr. Koch referred him for an ultrasound that revealed deep venous thrombosis ("DVT") in his left popliteal vein with swelling, pain, and color changes to his left lower leg. Tr. at

13

458, 504–505. Plaintiff followed up with Mark R. Jackson, M.D. ("Dr. Jackson"), who recommended he continue with outpatient anticoagulation and counseled him "regarding the necessity to elevate his leg." Tr. at 461.

On February 20, 2008, Plaintiff reported his medications provided little relief and made him "feel drunk." Tr. at 492. He complained of pain in his shoulders and arms and numbness in his hands. *Id.* Plaintiff's wife stated he was depressed and needed therapy. *Id.* Dr. Holdren referred Plaintiff for psychotherapy with Dr. John Burton and instructed him to return in four to six weeks. Tr. at 495. On March 11, 2008, Plaintiff stated his pain level was high, his pain medications were not lasting, and he was not getting sufficient sleep. Tr. at 496. Ms. Spears increased Plaintiff's dosages of Lunesta and Paxil and indicated "we feel that Psychotherapy is medically necessary for the pt to have in order to continue his care." Tr. at 499.

State agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), completed a physical residual functional capacity assessment on April 9, 2008. Tr. at 512–19. Dr. Van Slooten indicated Plaintiff could perform work with the following restrictions: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, balance, stoop, kneel, and crouch; occasionally climb ladders/ropes/scaffolds and crawl; occasionally reach overhead with the right upper extremity; frequently handle and finger with the bilateral upper extremities; and avoid concentrated exposure to hazards. *Id.*

14

Plaintiff followed up with a nurse in Dr. Holdren's office on April 10, 2008. Tr. at 533. He complained of arm pain and stated the workers' compensation carrier had yet to approve treatment with Dr. Burton and was pushing to settle his claim. *Id.*

On April 24, 2008, Dr. Holdren indicated Plaintiff had reactive depression, was prescribed Paxil, and had been referred to Dr. Burton for psychiatric care. Tr. at 520. She indicated Plaintiff's thought process was intact and his thought content was appropriate. *Id.* She described his mood/affect as worried/anxious and flat. *Id.* She indicated his attention/concentration and memory were good. *Id.* Dr. Holdren declined to comment on Plaintiff's ability to manage funds or his work-related limitations. *Id.*

On May 8, 2008, Plaintiff informed Dr. Holdren that his medications were only lasting for a few hours. Tr. at 537. Dr. Holdren instructed Plaintiff to follow up in four to six weeks, but noted Plaintiff might not be seen again without first obtaining psychiatric counseling. Tr. at 540.

State agency consultant Robbie Ronin, Ph. D., completed a psychiatric review technique on May 22, 2008. Tr. at 541–54. He indicated Plaintiff had depression, NOS with mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.*

On August 5, 2008, Frank Ferrell, M.D., completed a physical residual functional capacity evaluation. Tr. at 558–65. He indicated Plaintiff could perform work with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-

hour workday; frequently/moderately push and pull bilaterally; frequently climb ramps/stairs, balance, stoop, kneel, and crouch; occasionally climb ladders/ropes/scaffolds, and crawl; frequently reach, handle, and finger with the bilateral upper extremities; and avoid concentrated exposure to hazards. *Id.*

On August 13, 2008, Debra Price, Ph. D, completed a psychiatric review technique. Tr. at 566–79. She indicated Plaintiff had major depressive disorder, NOS and anxiety that imposed mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.*

Plaintiff presented to Dr. Koch for hypertension on August 26, 2008. Tr. at 586. Plaintiff had no edema in his bilateral lower extremities and his gait was normal. Tr. at 587. He had decreased abduction and internal and external rotation of his right shoulder, but normal adduction. *Id.*

Plaintiff was incarcerated at the Anderson County Detention Center in 2009. Tr. at 616. On March 4, 2009, Plaintiff requested to speak with someone from the mental health center and threatened to kill himself if he had to go to prison. *Id.* His prescription for Amitriptyline was increased. *Id.* On April 23, Plaintiff complained of lower back spasms and hip pain and was prescribed Soma. Tr. at 621. On May 14, Plaintiff was diagnosed with Methicillin-resistant Staphylococcus aureus ("MRSA") and prescribed Doxycycline. Tr. at 624, 626. On May 24, Plaintiff complained that he felt like he was having a nervous breakdown. Tr. at 627. The provider indicated Plaintiff initially stated he would not commit suicide, but later made suicidal statements. *Id.* The provider described

16

Plaintiff as "very manipulative." *Id.* Plaintiff was prescribed Haldol and Benadryl. *Id.* On May 30, Plaintiff complained of hearing voices and having dreams. Tr. at 628. He requested to speak with someone from the mental health center. *Id.* Plaintiff reported that he had experienced a light stroke on June 10, but the provider found no evidence of a stroke. Tr. at 632. On June 18, he complained of pain and a possible blood clot in his right leg. Tr. at 633. Plaintiff's leg was normal in color and temperature and had no edema. *Id.* Plaintiff continued to complain of hallucinations and his Haldol was increased to twice a day. *Id.* On June 24, Plaintiff complained of nightmares, hearing voices, and getting two to three hours of sleep nightly. Tr. at 634. Plaintiff complained of headaches as a side effect of Haldol on June 28. Tr. at 635. On June 29, he complained of worsened depression. Tr. at 636. On July 1, Plaintiff indicated he twisted his back when he fell off his bunk. Tr. at 637. On July 5, he complained of worsened swelling in his lower back. Tr. at 639. A lower extremity venous study on July 8 indicated no evidence of DVT in Plaintiff's right lower extremity. Tr. at 640. On July 10, Plaintiff complained that his depression had worsened and he requested to speak with Mrs. Campbell from mental health. Tr. at 641. Plaintiff reported severe swelling and pain in his back on July 12. Tr. at 642. The provider prescribed medication on July 14. *Id.* On July 13 and 23, Plaintiff reported worsened depression and requested to speak with someone from mental health. Tr. at 643–44. On August 14, Plaintiff's physician discontinued Haldol and Benadryl because Plaintiff indicated it was ineffective and wrote that Plaintiff seemed more depressed than psychotic. Tr. at 648.

17

Plaintiff presented to Dr. Koch on May 3, 2010, complaining of depression. Tr. at 677. Plaintiff stated he had lost weight and was "very tremulous." *Id.* He endorsed psychiatric symptoms that included anxiety, depression, insomnia, mood changes, panic attacks, stress, and tearfulness. *Id.* Dr. Koch indicated Plaintiff's mood and affect were depressed and sad. Tr. at 678. He noted Plaintiff had appropriate judgment regarding everyday activities, but had "a lack of insight concerning matters relevant to self." *Id.* Dr. Koch prescribed Fluoxetine and instructed Plaintiff to follow up in one month. *Id.*

Plaintiff did not follow up with Dr. Koch again until March 9, 2012, when he presented with a constant cough. Tr. at 679. He complained of stress, hand pain, leg pain, and shoulder pain. *Id.* Dr. Koch observed Plaintiff to have decreased right shoulder ROM and painful movement. Tr. at 680.

On September 25, 2012, Plaintiff attended a psychological consultative examination with Brian Keith, Ph. D. ("Dr. Keith"). Tr. at 658–61. Dr. Keith indicated Plaintiff interacted appropriately and was alert, attentive, coherent, and linear. Tr. at 659–60. Plaintiff reported occasional suicidal thoughts, but denied attempts to harm himself and visual or auditory hallucinations. Tr. at 660. He reported poor energy and fair appetite. *Id.* He complained of pain in his right arm and shoulder. *Id.* Plaintiff had adequate abstract reasoning and intact judgment, but his recall was impaired. *Id.* Dr. Keith classified Plaintiff's cognitive functioning as low-average. *Id.* Dr. Keith's impressions included "consider pain disorder with depression" and "[f]eatures of antisocial personality disorder." *Id.* Dr. Keith indicated Plaintiff was capable of managing his finances and could complete simple tasks and follow simple instructions. Tr. at 660–

18

61. He suggested Plaintiff may be a candidate for a job training program and noted he was attentive and cooperative and displayed sufficient concentration and persistence throughout the exam. Tr. at 661. Dr. Keith indicated no deficiencies to Plaintiff's abilities to understand, remember, and carry out instructions; to interact appropriately with supervisors, coworkers, and the public; and to respond to changes in a routine work setting. Tr. at 663–65.

On October 23, 2012, Plaintiff presented to J. David deHoll, M.D. ("Dr. deHoll"), for a consultative orthopedic evaluation. Tr. at 687–91. Plaintiff complained of constant "stocking like numbness and tingling particularly of his right upper extremity from the shoulder down" and constant bilateral upper extremity pain, right worse than left. Tr. at 688. Dr. deHoll indicated Plaintiff did not "complain of typical carpal tunnel symptoms." *Id.* He described Plaintiff as having a "very flat affect strongly suggesting significant clinical depression." *Id.* Dr. deHoll observed a two centimeter lipoma over Plaintiff's right supraspinatus area. *Id.* Plaintiff had significantly reduced active abduction and flexion of his right shoulder, but greater passive ROM with complaints of pain. *Id.* He was moderately tender at the AC joint and the edge of the acromion. *Id.* He had no obvious atrophy at the right shoulder girdle. *Id.* He had normal ROM of his cervical spine, but complained of diffuse pain on neck motion. *Id.* He had negative Tinel's over the ulnar nerve at his right elbow and Phalen's and Tinel's testing produced only localized pain in the area of palpation. *Id.* Plaintiff had no thenar or hypothenar atrophy and good peripheral pulses in his upper extremity. *Id.* He had full range of motion actively and passively in his left upper extremity and was a little tender over the ulnar

19

groove without ulnar nerve complaints. *Id.* He complained of left lower forearm pain with Phalen's testing, but had no specific median nerve related symptoms. *Id.* He had no thenar or hypothenar atrophy in his left upper extremity. *Id.* Plaintiff had normal lumbar ROM, but complained of pain at extremes of motion. *Id.* Dr. deHoll indicated Plaintiff had chronic subacromial pain, but that it was unlikely he had a rotator cuff tear. Tr. at 689. He indicated Plaintiff had atypical symptoms for a diagnosis of carpal tunnel syndrome and that his symptoms were "significantly aggravated by his clinical depression." *Id.* He wrote the following regarding Plaintiff's ability to work:

> In his current situation, I think it is unlikely that he can return to the previous employment that he was doing, his dominant problem needs to be addressed with further evaluation of his right shoulder, possible repeat injections and continued physical therapy. Given duration of symptoms as reported by the patient, the length of time that he has been unable to work, I am not optimistic that medical intervention is going to be able to restore him to the point that he can return to meaningful employment that involves significant use of upper extremities and manual tasks.

*Id.* Dr. deHoll indicated Plaintiff could not sort, handle, or use paper/files. Tr. at 697.

C.     The Administrative Proceedings

     1.     The Administrative Hearing

         a.     Plaintiff's Testimony

             1.     April 14, 2010

At the hearing on April 14, 2010, Plaintiff testified he lived in a boarding home with six others. Tr. at 43. He stated he was 47 years old. Tr. at 44. He indicated he was married, but separated. *Id.* He testified he completed the tenth grade, obtained a GED, and was able to read and write. Tr. at 45, 61. He stated he had not served in the military

or received vocational training. Tr. at 61. He indicated he was 5'10" tall and weighed 170 pounds. Tr. at 63.

Plaintiff testified that he injured his left shoulder and elbow while attempting to assemble a knee pad and his right shoulder while building a headrest. Tr. at 46–47. He stated his injuries affected his neck, bilateral shoulders, bilateral elbows, bilateral arms, bilateral wrists, and bilateral hands. Tr. at 47. He stated that his hands felt cold, asleep, and had a pins-and-needles feeling. Tr. at 52. He indicated he frequently clenched and unclenched his hands to relieve numbness and frequently dropped items and had difficulty with writing, threading needles, sewing buttons, and performing other small manipulations with his hands. Tr. at 53, 57–58.

Plaintiff denied receiving treatment for anxiety and depression. Tr. at 54. He stated he attempted to obtain mental health treatment at Anderson County Mental Health, but that they would not see him because he had no insurance and no money. *Id.*

Plaintiff testified that he had lost about 80 pounds over the prior year. Tr. at 63. He indicated that he had no appetite and that his pain caused him to feel sick when he tried to eat. *Id.*

Plaintiff testified he received pain-related therapy and injections from Dr. Holdren prior to May 2008. Tr. at 49–50. Plaintiff stated he had not seen a physician since around August 2008, except during a recent trip to the emergency room for MRSA. Tr. at 50. He indicated his insurance would not cover pre-existing conditions and he had grown tired of fighting with them over coverage. *Id.* Plaintiff testified that the 2008 settlement in his workers' compensation claim terminated his medical treatment. Tr. at 51. He indicated he

21

was no longer taking prescription medications, but occasionally took Tylenol and Aleve. Tr. at 55, 66.

Plaintiff testified he last worked on an assembly line for Grammer Industries on December 6, 2006. Tr. at 45, 65. He stated he worked as a general laborer for a construction company for about eight months. Tr. at 48. He indicated he worked as a self-employed window cleaner in the 1990s and managed one employee. Tr. at 48.

Plaintiff testified he could no longer perform the type of work he did at Grammer Industries because of the repetitive motion. Tr. at 55. He stated that his shoulder and arms ached if he used them for any length of time. Tr. at 55–56. He indicated he was no longer able to do construction work because of the lack of feeling in his hands. Tr. at 56. He stated he could no longer wash windows because he could not perform the overhead reaching. Tr. at 57.

Plaintiff testified he typically awoke between 6:15 and 6:30 each morning. Tr. at 58. He indicated he assisted the house superintendent in the kitchen, showered after breakfast, and sat on the porch for most of the day. *Id.* Plaintiff denied doing housework or shopping. *Id.* He indicated he washed his clothes, but had difficulty if he lifted too many clothes at one time. Tr. at 59–59. Plaintiff stated he went to bed around 11:30 p.m., but did not fall asleep until 2:00 or 3:00 a.m. because of his pain.  Tr. at 60. Plaintiff stated he could walk for five minutes before needing to rest because of lower back pain. Tr. at 60–61. He denied using any assistive device to walk. Tr. at 67. He indicated he had a driver's license and drove to the hearing. Tr. at 63–64. Plaintiff testified that he spoke on the phone to his son and a few friends and visited the same people. Tr. at 68. He

denied attending church or participating in outdoor recreation or hobbies. Tr. at 68–69. Plaintiff testified that he read for about two hours per day. Tr. at 71.

Plaintiff confirmed that he received a settlement in his workers' compensation claim. Tr. at 51. He stated that he used the money to pay past-due bills and large expenses so his family could meet their obligations on his wife's income. Tr. at 51–52.

Plaintiff testified his probation officer had arranged for him to live in the boarding house because he had nowhere to live because he was on probation for a "lewd act" until 2014. Tr. at 62.

### 2.    November 2, 2012

At the hearing on November 2, 2012, Plaintiff testified that he weighed 245 pounds and that his weight caused him to tire easily and to have some difficulty breathing. Tr. at 10, 22. He indicated he had greater limitation in his right upper extremity than in his left. Tr. at 23.

Plaintiff testified that he had obtained little treatment because he could not afford to see a doctor. *Id.* He stated that he attempted to obtain treatment at a free clinic, but was told to come back on a later date. *Id.* Plaintiff indicated he attempted to see a psychiatrist or psychologist, but was unable to do so because he did not have insurance. Tr. at 23. Plaintiff denied taking any prescribed medications, but stated he took ibuprofen and Aleve. Tr. at 24.

Plaintiff testified that he was incarcerated after being accused of molesting his stepdaughter. *Id.* He indicated he pled guilty. *Id.*

b.    Vocational Expert Testimony

1.    April 14, 2010

Vocational Expert ("VE") Karl S. Weldon reviewed the record and testified at the hearing. Tr. at 72–79. The VE categorized Plaintiff's PRW as an automotive assembler as light with a specific vocational preparation ("SVP") of two and a window cleaner as medium with a SVP of two. Tr. at 73–73. The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to work at the light exertional level with occasional crawling, right overhead reaching, and climbing of ladders, ropes, and scaffolds and frequent bilateral handling, fingering, and performance of all other postural activities. Tr. at 73. The VE testified that the hypothetical individual could perform Plaintiff's PRW as an automotive assembler, *Dictionary of Occupational Titles* ("*DOT*") number 806.684-010. Tr. at 74. The ALJ modified the hypothetical to include the restrictions in the first hypothetical, but to add frequent bilateral pushing and pulling with the bilateral upper extremities and avoidance of constant or repetitive motion with the bilateral shoulders. Tr. at 75. The ALJ asked if the additional restrictions would modify the VE's response. *Id.* The VE testified that the automotive assembler position required repetitive motion. Tr. at 76. The ALJ asked the VE if there would be other work available to the individual. *Id.* The VE indicated the individual could perform light and unskilled work as a machine operator, *DOT* number 690.685-194, with 1,400 jobs in the upstate and 142,000 jobs nationally and an assembler, *DOT* number 739.684-094, with 1,200 jobs in the upstate and 288,000 jobs nationally. *Id.* The VE confirmed his testimony was consistent with the *DOT*. Tr. at 77.

24

Plaintiff's counsel asked the VE if an individual who missed work more than one day per week was employable. Tr. at 79. The VE indicated the individual was not employable in any occupation. *Id.* He further explained that more than two absences per month were not permitted. *Id.* Plaintiff's counsel asked the VE if the individual's use of pain medication had an impact on whether he was employable. *Id.* The VE testified that it would depend on the individual, but could be dangerous. *Id.*

### 2.    November 2, 2012

VE G. Roy Sumpter reviewed the record and testified at the hearing on November 2, 2012. Tr. at 27–36. The VE categorized Plaintiff's PRW as an automotive assembler as medium with an SVP of two. Tr. at 27. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; could sit, stand, and walk about six hours each in an eight-hour workday; could occasionally climb ladders, ropes, or scaffolds; could occasionally crawl; could frequently perform all other postural activities; should limit overhead reaching to occasional on the right; should limit bilateral reaching, handling, and fingering to frequent; should avoid concentrated exposure to hazards such as unprotected heights or dangerous machinery; could concentrate, persist, and work at pace to do simple, routine, repetitive tasks at SVP levels of one and two for two-hour periods in an eight-hour day; could interact occasionally with the public; and could interact appropriately with coworkers and supervisors. Tr. at 27–28. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 28. The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could

perform. *Id.* The VE identified light jobs with an SVP of two that included work as a laundry worker, *DOT* number 302.685-010, with 917,000 positions nationally and 18,000 in South Carolina; a final inspector, *DOT* number 727.687-054, with 505,000 positions nationally and 11,000 in South Carolina; and a bench assembler, *DOT* number 706.684-042, with 250,000 positions nationally and 5,500 in South Carolina. Tr. at 28–29. The ALJ asked the VE if the individual could perform the same jobs if he were restricted to frequent pushing and pulling with the bilateral upper extremities. Tr. at 29. The VE testified that he could perform the same jobs. *Id.* The ALJ then asked the VE to further assume that the individual was limited to occasional reaching, handling, and fingering with the right upper extremity. *Id.* The VE testified that the individual would be unable to perform the job as a bench assembler with that limitation. Tr. at 30. The ALJ next asked the VE to assume that the individual was limited as indicated by the medical expert ("ME") to lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk about six hours each during an eight-hour workday; could not crawl or climb ladders, ropes, or scaffolds; could occasionally reach overhead with the right upper extremity; could perform all other postural activities on a frequent basis; and had the same mental limitations specified in the first hypothetical. Tr. at 31. The ALJ asked if the individual could perform any jobs. *Id.* The VE testified that the individual could perform jobs as a laundry worker and final inspector. *Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual was unable to use his upper extremities or perform manual tasks for one-third of the workday. Tr. at 34. He asked how that restriction would affect the individual's ability to perform the jobs

identified in response to the ALJ's hypothetical questions. *Id.* The VE testified that such a restriction would be "incompatible with any type of competitive employment." *Id.* Plaintiff's attorney asked the VE how an inability to use paper files would affect the jobs identified in response to the ALJ's hypotheticals. Tr. at 34. The VE testified that the jobs did not involve the use of paper files, but it if the restriction were interpreted to mean that the individual could not keep a written count of items, it would reduce the number of laundry worker jobs by 25 percent. *Id.* He indicated it would not affect the bench assembler and final inspector positions. Tr. at 36.

c.     Medical Expert Testimony

ME Arthur Brovender, M.D., reviewed the record and testified by telephone at the hearing on November 2, 2012. Tr. at 8–10. He stated that he was board-certified in the field of orthopedics. Tr. at 8. The ME indicated he had not examined Plaintiff, but had reviewed his medical records. Tr. at 9. He stated Plaintiff's most significant problems were tendinosis and mild osteoarthritis of the acromioclavicular joint of his left shoulder, mild epicondylitis and possible ulnar neuropathy of his left elbow, mild osteoarthritis of the acromioclavicular joint and tendinosis of the rotator cuff off his right shoulder, possible mild cervical compression fracture or degenerative spondylosis and foraminal narrowing of his cervical spine, and bilateral CTS. Tr. at 10–11. The ALJ asked the ME if Plaintiff's impairments met a Listing. Tr. at 11. The ME indicated that he considered Listings 1.02 and 1.04, but that Plaintiff did not meet a Listing. *Id.* The ALJ asked the ME to provide an opinion as to Plaintiff's physical limitations. *Id.* The ME testified that Plaintiff could sit for six to eight hours with normal breaks; could stand and walk for six

to eight hours with normal breaks; could lift 10 pounds frequently and 20 pounds occasionally; could bend, stoop, squat, and kneel frequently; should not crawl; could climb stairs and ramps frequently; should avoid ladders, ropes, and scaffolds; should only lift overhead with his right upper extremity on an occasional basis; and could perform occasional fine fingering bilaterally. Tr. at 12. The ME testified that positive Tinel's and Phalen's signs did not indicate any particular degree of functional limitation or loss in and of themselves. Tr. at 14. He testified that muscle atrophy occurred with severe CTS and that Plaintiff had no evidence of muscle atrophy. Tr. at 15–16. He indicated Plaintiff could frequently reach and handle. Tr. at 16.

The ME indicated that another EMG would be helpful in determining Plaintiff's problems with his bilateral arms and hands. Tr. at 17. He testified that he no longer practiced as an orthopedic surgeon and that his work was limited to providing opinions to the Social Security Administration ("SSA"). Tr. at 18. He indicated he did not consider Plaintiff's psychological limitations in forming his opinion. Tr. at 20.

### 2.    The ALJ's Findings

In his decision dated December 11, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on March 31, 2012.
2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 6, 2006 through his date last insured of March 31, 2012 (20 CFR 404.1571 *et seq.*).
3.    Through the date last insured, the claimant had the following severe combination of impairments: bilateral carpal tunnel syndrome, right shoulder impingement, cervical spondylosis, cervicalgia, depression, anxiety (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can sit 6 hours of 8 hours, stand/walk 6 hours of 8 hour workday; lift/carry, push/pull 10 pounds frequently, 20 pounds occasionally; occasional fine manipulation or fingering bilaterally; frequently bend, stoop, squat, climb ramps, stairs; never climb ladders, ropes, scaffolds, or crawl. The claimant can occasionally reach overhead with right upper extremity. He should avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery. He can concentrate, persist and work at pace to do simple, routine, repetitive tasks at SVP levels 1 and 2 for 2-hour periods in an 8-hour day. He can interact occasionally with the public; and interact appropriately with supervisors and co-workers in this type of stable routine setting.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on April 8, 1963 and was 48 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 6, 2006, the alleged onset date, through March 31, 2012, the date last insured (20 CFR 404.1520(g)).

Tr. at 93–101.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ erred in allowing the ME to testify by telephone;

2)     the ALJ failed to adequately develop the record by declining to refer Plaintiff for an EMG;

3)     the ALJ incorrectly assessed Plaintiff's RFC based on misstatement and mischaracterization of the record;

4)     the ALJ failed to properly address evidence from Plaintiff's treating physicians; and

5)     the ALJ did not properly consider the orders of the South Carolina Workers' Compensation Commission.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in

substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

(1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.      Analysis

            1.      ME's Testimony By Telephone

Plaintiff argues the ALJ violated his due process rights by allowing the ME to testify by telephone, without notifying him and despite his objection. [ECF No. 14 at 8–9]. Plaintiff indicates the regulations at the time of his hearing only provided for witnesses to testify in person or through video teleconferencing. *Id.* Plaintiff maintains that courts that have addressed this issue have rejected testimony by telephone. *Id.* at 9, *citing Edwards v. Astrue*, No. 3:10-1017-MRK, 2011 WL 3490024 (D. Conn. Aug. 10, 2011); *Porter v. Barnhart*, No. C05-5166-FDB (W.D. Washington, Apr. 11, 2006); *Ainsworth v. Astrue*, No. 09-286-SM, 2010 WL 2521432 (D.N.H. June 17, 2010); and *Morlando v. Astrue*, No. 3:10-1258-MRK, 2011 WL 4396785 (D. Conn. Sept. 20, 2011).

Finally, Plaintiff contends that the ALJ's allowance of the ME's testimony by telephone was not harmless error because it undermined his right to confront the witness. *Id.*

The Commissioner argues that Plaintiff's counsel questioned and confronted the ME and that Plaintiff was not compromised by the ME's testimony by telephone. [ECF No. 16 at 12]. The Commissioner maintains that several courts have recently found that remand was not required where the plaintiff failed to prove he was prejudiced by the VE's telephonic testimony and the ALJ's failure to provide advance notice thereof. *Id.* at 14, *citing Green v. Astrue*, No. 11-11711-PBS, 2013 WL 636962 (D. Mass. Feb. 13, 2013); *Tardiff v. Astrue*, No. 11-17-JD, 2012 WL 7777484 (D.N.H. Mar. 7, 2012); and *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

The version of 20 C.F.R. § 404.950(e) effective at the time of Plaintiff's hearing provided that "[w]itnesses may appear at a hearing in person or, when the conditions in § 404.936(c) exist, by video teleconferencing." 20 C.F.R. § 404.950(e) (Aug. 9, 2010). After Plaintiff's hearing, 20 C.F.R. § 404.950(e) was revised to include the words "or telephone" and to refer to the conditions in 20 C.F.R. § 404.936(c)(2). 20 C.F.R. § 404.950(e) (June 20, 2013).

The version of 20 C.F.R. § 404.936(c) effective at the time of Plaintiff's hearing provided as follows:

> The administrative law judge will determine that the appearance of a person be conducted by video teleconferencing if video teleconferencing technology is available to conduct the appearance, use of video teleconferencing to conduct the appearance would be more efficient than conducting the appearance in person, and the administrative law judge determines that there is no circumstance in the particular case that prevents the use of video teleconferencing to conduct the appearance.

20 C.F.R. § 404.936(c) (Aug. 9, 2010). However, the current version divides 20 C.F.R. § 404.936(c) into two parts. 20 C.F.R. § 404.936(c) (June 20, 2013). The first part addresses the ALJ's discretion on whether to use video teleconferencing. 20 C.F.R. § 404.936(c)(1) (June 20, 2013). The second part, referenced in the revised version of 20 C.F.R. § 404.950(e), provides as follows:

> The administrative law judge will determine whether any person other than you or any other party to the hearing, including a medical expert or a vocational expert, will appear at the hearing in person, by video teleconferencing, or by telephone. If you or any other party to the hearing objects to any other person appearing by video teleconferencing or by telephone, the administrative law judge will decide, either in writing or at the hearing, whether to have that person appear in person, by video teleconferencing, or by telephone. The administrative law judge will direct a person other than you or any other party to the hearing if we are notified as provided in paragraph (e) of this section that you or any other party to the hearing objects to appearing by video teleconferencing, to appear by video teleconferencing or telephone when the administrative law judge determines:
>
> (i) Video teleconferencing or telephone equipment is available;
>
> (ii) Use of video teleconferencing or telephone equipment would be more efficient than conducting an examination of a witness in person; and
>
> (iii) The ALJ determines there is no other reason why video teleconferencing or telephone should not be used.

20 C.F.R. § 404.936(c)(2) (June 20, 2013).

Prior to the hearing, Plaintiff's counsel submitted to the ALJ a memorandum of law in which he argued that testimony by telephone was not permitted in Social Security claims. Tr. at 271–73. Plaintiff's attorney also objected to the ME's testimony by

telephone during the hearing. Tr. at 5–7. The ALJ overruled the objection and explained

his reasons as follows:

> Okay and I fully understand the basis for your objection because it would be possibly the best of all possible worlds if every witness could be here in person but the fact of the matter is I'm going to overrule that objection for a number of reasons. One of which is we have no one locally available to do this particular kind of medical expert testimony. So we have to use people off our regional roster to do that. Basically, there are some other reasons why I feel that it's appropriate to take evidence in this manner. The appeals council remanded this case for two reasons, one of which concerns probably Dr. Brovinder more than the other and that is that the appeals council felt that perhaps the state agency's assessment of the claimant's— of the functional limitations of the claimant's carpal tunnel syndrome and limiting them only to frequently reaching, handling and fingering was an appropriate [sic] but they remanded it without any medical documentation on their part as to why they felt this. So that is one reason why we have Dr. Brovinder here today to help me understand the particular import of these particular findings of positive Tinel's and positive Phalen signs in the past, even though the most recent consultative of examination which Dr. Brovinder apparently does not have yet, based upon my brief conversation with him immediately before the hearing just to see if he was there indicates that they are not there and we will send that information on to him for any updated report that he might give us. Also, ruling 8320 requires that I obtain a medical expert to help me in assessing these conditions for onset date and for periods in the past which is specifically applicable here as we are talking about a period of disability now in the past for December 6, 2006 through March 31, 2012. Also, there are regulatory bases for overruling this objection. From the time of inception of the disability hearing program, the regulations have given the ALJ the authority to cite how evidence will be presented. This is an inherent power of the hearing officer. The phrasing has been permissive using may and will, rather than shall and must as to the admissibility of evidence. The recent regulations allowing for videoconferencing do not change this. They just explicitly permit an additional way to receive evidence. Ever since the regulations were written on August 5, 1980, at 45FR 52078, it has been the legal position of SSA that no substantive changes were intended from what historically has always been the province of the ALJ to decide when and how evidence is to be presented. Historically, it's been the practice for 30 years or more to obtain certain evidence as needed on a practical basis over the telephone. This is consistent with the decision of the US Supreme Court in Richardson v. Parlays [phonetic], 402 US 389, 1971 with regard to

> submitting evidence in SSA informal hearings and finally, as a practical matter where SSA ALJs hold over 500,000 hearings a year, this is the only way we can get certain needed evidence and expertise with the ability to question the provider of that opinion on a full and fair proceeding. So that takes care of that.

*Id.* In his decision, the ALJ indicated he overruled Plaintiff's attorney's objection for the reasons stated on the record. Tr. at 91.

The undersigned recommends the court reject Plaintiff's argument that the case should be remanded based on the ALJ's failure to provide notice that the VE would testify by telephone. In *Edwards*, the district court discussed the importance of advanced notice of testimony by telephone and found that the ALJ committed legal error by failing to inform the plaintiff that the medical expert would be testifying by telephone. 2011 WL 3490024 at *7. However, the court in *Edwards* referenced *Rice v. Astrue*, 5:09-93-JTR, 2010 WL 3417803 (E.D. Ark. Aug. 26, 2010). *Id.* In *Rice*, the court found that the plaintiff was not harmed because she had actual notice that the witness would be testifying by telephone. *See* 2010 WL 3417803 at *7 n.7. The court's conclusion was based on the fact that the record included a pre-hearing form in which the plaintiff objected to expert testimony by telephone. *Id.* The decisions in *Edwards* and *Rice* are not in conflict because *Edwards* indicates remand is appropriate where a claimant receives no advance notice of expert testimony by telephone and *Rice* indicates remand is inappropriate where a claimant has actual notice of the testimony by telephone in advance, rendering the failure to notify the claimant to be harmless error. Although neither *Edwards* nor *Rice* is binding upon this court, the undersigned considers the reasoning in these cases to be persuasive. It is unclear from the record when Plaintiff

received actual notice that the ME's testimony would be provided by telephone, but the record reflects that he was aware at least the day before the hearing because he filed an objection to the telephonic testimony on November 1, 2012. *See* Tr. at 271–73. Because the record indicates Plaintiff had actual knowledge that the ME would provide testimony by telephone prior to the hearing and time to prepare for that testimony, the undersigned recommends a finding that the ALJ's failure to notify Plaintiff that the testimony would be taken by telephone was harmless.

The propriety of witness testimony by telephone in Social Security disability claims appears to be an issue of first impression in both this court and the Fourth Circuit. Plaintiff urges the court to adopt the position of district courts that have found that experts cannot testify by telephone under 20 C.F.R. § 404.950. *See* [ECF No. 14 at 9]. The Commissioner argues that the court should look to other districts that have found harmless error where witnesses testified by telephone, as long as the claimant was not prejudiced. [ECF No. 16 at 12]. In light of changes to the regulations, the undersigned finds the Commissioner's position to be the most practicable. Although 20 C.F.R. § 404.950 did not provide for testimony by telephone during Plaintiff's 2012 hearing, it now allows it. Were the undersigned to recommend remand merely based on the ALJ's use of medical testimony by telephone as opposed to video teleconferencing, a remand would have no practical effect. On remand, the ALJ could allow the medical expert to testify by telephone, if he satisfied the requirements of 20 C.F.R. § 404.936(c), and

Plaintiff would have no recourse. Therefore, the undersigned must determine whether the ALJ properly overruled Plaintiff's objection. *See* 20 C.F.R. § 404.936(c).[3]

The undersigned recommends a finding that the ALJ improperly concluded that the circumstances of Plaintiff's case did not require the use of in-person testimony. In *Green v. Astrue*, 2013 WL 636962 at *11, the court found that while the ALJ erred in allowing an expert's telephonic testimony, remand was not warranted because the plaintiff failed to demonstrate that harm or prejudice resulted from the error. Similarly, in *Tardiff v. Astrue*, 2012 WL 777484 at *6, the court indicated that it had not adopted a rule that telephonic testimony could not be used in social security hearings and would instead consider the circumstances to determine whether telephonic testimony prejudiced the claimant. Because Plaintiff fails to specify how he was compromised by the ALJ's use of expert testimony by telephone, the undersigned has reviewed the record to determine whether substantial evidence supports the ALJ's decision to overrule Plaintiff's objection to the ME's testimony by telephone. Although the ALJ provided a lengthy explanation for his decision to overrule the objection, the explanation itself indicates why the ALJ should not have allowed the testimony by telephone.

---

[3] The undersigned finds no material difference in the former part of 20 C.F.R. § 404.936(c), that permitted an ALJ to overrule an objection to video teleconferencing if he determined there was "no circumstance in the particular case" that prevented the use of video teleconferencing to conduct the appearance and the current section that permits the ALJ to overrule the objection if "there is no other reason why video teleconferencing or telephone should not be used." *See* 20 C.F.R. 404.936(c) (August 9, 2010); 20 C.F.R. § 404.936(c)(2), (June 20, 2013).

The ALJ emphasized the importance of the ME's testimony and his review of the record based on the findings of the Appeals Council, but stated that the ME did not have all of the relevant evidence. Tr. at 5–6. Because the ME testified by telephone and had not received copies of the additional exhibits by mail, he did not review Plaintiff's most recent medical records before providing his testimony.[4] *See* Tr. at 8. The ME assessed Plaintiff's RFC without considering the implications of any medical evidence after December 1, 2009.[5] *See id.* Although the ALJ indicated that the ME could provide updates after reviewing the additional records and that "everyone" would have a "chance to comment," the record does not reflect that the ALJ sought any additional evidence from the ME after the hearing. *See* Tr. at 9. Because it is possible that the ME's opinion would have differed if he had appeared in person at the hearing and reviewed the additional evidence, the undersigned is compelled to find that Plaintiff was prejudiced by the ME's testimony by telephone. Therefore, the undersigned recommends a finding that substantial evidence did not support the ALJ's decision to overrule Plaintiff's objection to the ME's testimony by telephone because there was a significant reason why testimony by telephone should not have been used. *See* 20 C.F.R. § 404.936(c).

---

[4] Although the ME indicated he had reviewed evidence through March 31, 2012, the record through Exhibit 30F only pertained to the period through December 1, 2009. It did not include records from Dr. Keith, Dr. Koch (August 26, 2008–March 9, 2012), and Dr. deHoll. *See* Tr. at 9, 104–06.

[5] The ALJ read aloud to the ME portions of Dr. deHoll's assessment, but the ME did not have access to the entire report. *See* Tr. at 15.

2.    ALJ's Failure to Develop the Record

Plaintiff argues the ALJ ignored the ME's suggestion and his counsel's request that he be referred for an EMG. [ECF No. 14 at 10]. He maintains that the EMG results would have been relevant even though they would have been provided after his date last insured ("DLI"). *Id.*

The Commissioner argues that the ALJ did not err by failing to order Plaintiff to undergo an EMG. [ECF No. 16 at 15]. She indicates the record contains an EMG from 2006 and maintains that the ME did not suggest a need for Plaintiff to have a new EMG. *Id.* She further contends that a new EMG would not be influential because Plaintiff was last insured for DIB seven months prior to the hearing. *Id.* at 16.

"[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173, citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980). To fulfill this duty, the ALJ may refer a claimant for a consultative examination to resolve inconsistencies in the evidence or when the medical evidence is insufficient to allow the ALJ to make an informed decision on the claim. 20 C.F.R. § 404.1519a(b). The SSA may purchase consultative examinations to obtain clinical findings, laboratory tests, diagnoses or prognoses under the following non-exclusive circumstances:

(1) The additional evidence needed is not contained in the records of your medical sources;

41

(2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;

(3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical source; or

(4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

*Id.*

In his decision, the ALJ denied Plaintiff's motion that the ALJ order an EMG "as this would be after the date last insured and of little probative evidence concerning his condition before March 31, 2012." Tr. at 91.

The undersigned recommends a finding that the ALJ provided an insufficient reason for declining to refer Plaintiff for an EMG. In *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 341 (4th Cir. 2012), the Fourth Circuit held that evidence produced after a claimant's DLI was generally admissible as long as "the evidence permits an inference of linkage with the claimant's pre-DLI condition." The court further held that "retrospective consideration of medical evidence is especially appropriate when corroborated by lay evidence." *Id.* at 342. In *Foshee v. Astrue*, No. 4:11-2912-RMG, 2013 WL 310657 (D.S.C. Jan. 25, 2013), this court reversed and remanded the claim where the ALJ ignored post-DLI evidence that "clearly 'permits an inference of linkage' by addressing the same complaints of severe pain in the same anatomical area of the body producing, per the claims of the Plaintiff, the same disabling impairments." *Id.*, *citing Bird* at 342. Here, the record contained diagnostic tests that indicated Plaintiff had moderate-to-severe

CTS in 2006 and additional objective and lay evidence that suggested his CTS subsequently worsened between 2006 and his DLI. *See* Tr. at 421–22. On January 22, 2007, Dr. Stewart indicated Plaintiff scored below the second percentile on the Penn Bi-Manual Dexterity Worksample. Tr. at 603. Dr. Seastrunk assessed weakened bilateral grip strength on April 17, 2007. Tr. at 614. Plaintiff reported severe bilateral hand pain to Dr. Holdren on July 30, 2007. Tr. at 463. On October 25, 2007, Plaintiff complained to Ms. Spears of constant pain and more stiffness and numbness in his hands. Tr. at 476. During the hearing on April 14, 2010, Plaintiff testified that his hands felt cold, asleep, and had a pins-and-needles feeling. Tr. at 52. He stated he frequently dropped things and had difficulty writing, threading needles, sewing buttons, and performing small manipulations. Tr. at 57–58. On October 23, 2012, Plaintiff complained to Dr. deHoll of stocking-like numbness and tingling in his right upper extremity and constant bilateral upper extremity pain and Dr. deHoll indicated he was not optimistic that Plaintiff would be able to return to meaningful employment that involved significant use of his upper extremities and manual tasks. Tr. at 688–89. The record contains an undated letter from Leslie Parker, who indicated she had been Plaintiff's neighbor since December 2010 and had observed that Plaintiff's "hands release objects" and that he had recently spilled a drink in her home when attempting to lift a glass. Tr. at 270. The objective and lay evidence of impairment and functional limitations to Plaintiff's bilateral upper extremities before and after Plaintiff's DLI supported an inference of linkage to an EMG performed after Plaintiff's November 2012 hearing and the ALJ's conclusion to the contrary was not sustained by the applicable law or the evidence in the record.

The undersigned further suggests that the ALJ did not adequately develop the record based on suggestions by Dr. deHoll and the ME that the record was insufficient to allow the ALJ to make an informed decision on the claim. *See* 20 C.F.R. § 404.1519a(b). Dr. deHoll's report indicates he only had access to Plaintiff's objective test results from 2003 and 2004 and had "no current nerve conductions."[6] Tr. at 687, 689. The ME concluded Plaintiff's CTS was not severe and assessed functional limitations based on a lack of muscle atrophy, but he indicated that an EMG would provide a better indication of Plaintiff's functional limitations if it indicated severe CTS. *See* Tr. at 14, 15. The ALJ asked the ME if there was "anything else" he "could tell us that would help me arrive at a good decision in this case." Tr. at 16. The ME indicated "[t]he only other thing is they could do another EMG." Tr. at 17. Plaintiff's attorney then requested an EMG. *Id.* The ALJ indicated the state agency was likely unwilling to refer the claimant for an EMG, but indicated "we can certainly ask them and see." Tr. at 18.

A review of the criteria under which the SSA may order consultative examinations reveals the presence of at least three in this case. *See* 20 C.F.R. § 404.1519a(b). Plaintiff confirmed that he had not had recent electrodiagnostic studies, which indicates the additional evidence needed was not contained in the records of his medical sources. *See* Tr. at 17; *see also* 20 C.F.R. § 404.1519a(b)(1). The electrodiagnostic studies were "highly technical or specialized medical evidence" that was not available from Dr. Koch, Plaintiff's most-recent treatment provider. *See* 20 C.F.R. § 404.1519a(b)(2). Finally, the

---

[6] The undersigned notes that Dr. deHoll did not indicate he had copies of Plaintiff's November 2006 NCS and EMG that showed objective evidence of moderate left CTS and moderate-to-severe right CTS.

records suggested a possible change in Plaintiff's condition since the November 2006 electrodiagnostic testing that was "likely to affect" his "ability to work," but "the current severity of" his CTS was "not established." 20 C.F.R. § 404.1519a(b)(4). Despite these circumstance marshalling in favor of additional testing under 20 C.F.R. § 404.1519a(b) and despite the ALJ's indication to Plaintiff and his attorney that he would "ask" the state agency and "see," the ALJ declined to order the additional testing. Therefore, the undersigned concludes that the ALJ failed to fulfill his duty to develop the record.

3.    Improper RFC Based on Mischaracterization of the Record

Plaintiff argues that the ALJ referenced evidence in the record that supported denying benefits and ignored evidence favorable to him. [ECF No. 14 at 10–11]. The Commissioner argues that the ALJ thoroughly reviewed the record and properly assessed Plaintiff's RFC. [ECF No. 16 at 16–17].

RFC is an assessment of the claimant's ability to perform sustained work-related activities eight hours per day, five days per week. SSR 96-8p. The ALJ must identify the limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. *Id.* "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* It must be based on all of the relevant evidence in the case record, which includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-

determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.*

In light of the foregoing authority, the undersigned considers the specific issues raised by Plaintiff regarding the ALJ's RFC assessment.

### a.    Dr. Stewart's Findings

Plaintiff argues the ALJ ignored Dr. Stewart's findings, and specifically cites evidence of severe levels of depression and anxiety, an overall poor quality of life, and slow work speed and pace. [ECF No. 14 at 11]. The Commissioner contends the ALJ discussed Dr. Stewart's testing in his decision and provided valid reasons for discounting it. [ECF No. 16 at 18].

The undersigned recommends a finding that the ALJ's assessment of Plaintiff's RFC was not based on all of the relevant evidence in the case record to the extent that he excluded evidence from Dr. Stewart's testing. The ALJ declined to address all but the WRAT-R4 and the Penn Bi-Manual Dexterity Worksample test and discounted the Penn Bi-Manual Dexterity Worksample based on the lack of a statement of validity or effort expended. *See* Tr. at 98. Although Dr. Stewart did not specifically state that Plaintiff put forth good effort on that particular test, he indicated Plaintiff did not exaggerate. *See* Tr. at 603. Dr. Stewart wrote:

> He was considered to be straightforward in describing his conditions, and did not tend to exaggerate or overstate his disabilities or situation. That is, his descriptions and allegations of his injuries and ongoing problems and limitations were consistent with the medical/orthopedic/neurological/ psychological records.

*Id.* The undersigned is unpersuaded by the ALJ's reason for discounting the Penn Bi-Manual Dexterity Worksample. Given Dr. Stewart's assessment of Plaintiff's overall presentation, the record does not demonstrate that Plaintiff failed to put forth good effort on this particular test. In addition, the ALJ failed to address Dr. Stewart's findings that suggested Plaintiff had severe depression and anxiety and an overall poor quality of life. *See* Tr. at 604. In neglecting to address these results, the ALJ assessed an RFC that failed to consider the entire record. *See* SSR 96-8p.

b.    Plaintiff's Educational Background

Plaintiff maintains the ALJ erroneously indicated he had a high school education. [ECF No. 14 at 11]. The Commissioner argues that the ALJ properly considered Plaintiff's academic ability. [ECF No. 16 at 18 n.1].

Pursuant to 20 C.F.R. § 404.1564(b), "the numerical grade level that you completed in school may not represent your actual educational abilities," which may be higher or lower. If there is no evidence to contradict the notion that the claimant's numerical grade level completed represents his actual educational abilities, the ALJ will consider the numerical grade level to determine his educational level. *Id.* However, if the claimant's numerical grade level does not reflect his actual educational abilities, the ALJ should consider evidence that suggests higher or lower educational abilities. *Id.*

Claimants are considered to have a high school education or above if they have abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a twelfth grade level or above. 20 C.F.R. § 404.1564(b)(4). "We generally consider

that someone with these educational abilities can do semi-skilled through skilled work." *Id.*

The ALJ found that Plaintiff had at least a high school education and noted he performed on a seventh to eighth grade level. Tr. at 99. He limited Plaintiff to unskilled work at SVP levels one and two. Tr. at 96.

Plaintiff testified he completed the tenth grade and obtained a GED Tr. at 45. Plaintiff's scores on the WRAT-R4 were between grades 6.9 and 8.1. Tr. at 603.

The undersigned recommends a finding that the ALJ adequately considered Plaintiff's educational history in assessing his RFC. Although Plaintiff argues to the contrary, a GED is a high school credential.[7] As such, it reflects abilities in reasoning, arithmetic, and language skills equivalent to a twelfth grade level. *See* 20 C.F.R. § 404.1564(b)(4). Therefore, the undersigned finds that the ALJ did not err in finding Plaintiff had a high school education. However, because the record suggested Plaintiff's educational attainment was inconsistent with his actual educational abilities, the ALJ was required to consider that additional information. *See* 20 C.F.R. § 404.1564(b). The undersigned finds that the ALJ properly assessed Plaintiff's educational abilities when he acknowledged Plaintiff performed at a level below that of a high school graduate and found he was limited to unskilled work.

---

[7] "Since 1942, the Tests of General Educational Development (GED) has offered adults an alternative path to earn a high school diploma." South Carolina State Department of Education, General Educational Development (GED) (Jan. 27, 2015), *available at* http://ed.sc.gov/agency/programs-services/92/. "The GED test continues to offer adults a second chance at a high school credential." *Id.*

### c.     Symptom Stability and Mental Health Treatment

Plaintiff argues that the ALJ erroneously stated his depression was stable and that he had no history of mental health treatment. [ECF No. 14 at 11]. The Commissioner maintains that the ALJ considered Plaintiff's depression and anxiety in assessing them as severe impairments. *Id.* ECF No. 16 at 18–19.

The undersigned recommends a finding that the ALJ failed to consider the entire record regarding Plaintiff's depression. *See* SSR 96-8p. The ALJ neglected to consider Dr. Stewart's findings and failed to acknowledge that Plaintiff obtained mental health treatment while he was incarcerated. *See* Tr. at 604, 616–56. Although the ALJ found depression and anxiety to be severe impairments, the undersigned is compelled to find that he did not properly consider the functional effects of Plaintiff's mental impairments where he failed to consider all of the evidence in the record pertaining to those impairments.

### 4.     Treating Physician's Evidence

Plaintiff argues the ALJ ignored evidence from Plaintiff's treating physicians in favor of opinions from non-treating medical sources. [ECF No. 14 at 13]. He specifically maintains the ALJ neglected evidence from Dr. Koch of restricted ROM of his right shoulder and evidence from Dr. Holdren of depression. *Id.* at 11–12. Plaintiff argues the ALJ discounted Dr. Seastrunk's opinion because it was obtained by his counsel in his workers' compensation claim. *Id.* at 14–15.

The Commissioner argues that the ALJ discounted Dr. Holdren's 2008 opinion that Plaintiff had debilitating and chronically uncontrolled depression in favor of Dr.

49

Keith's opinion because Dr. Holdren was a pain management physician and Dr. Keith was a psychologist who assessed Plaintiff's abilities in 2012. [ECF No. 16 at 19]. She maintains the ALJ also supported his decision to discount Dr. Holdren's opinion by citing Plaintiff's ADL's and Dr. Koch's treatment note that indicated Plaintiff was in no acute distress. *Id.* She contends that the ALJ considered impairment to Plaintiff's right shoulder in assessing his RFC. *Id.* at 20. The Commissioner argues the ALJ was required to consider and entitled to rely upon the state agency physicians' opinions. *Id.* at 21. The Commissioner argues the ALJ properly considered the opinions of Drs. Stewart and Seastrunk, but declined to accord them controlling weight because they provided opinions on the issue of disability, which is reserved to the Commissioner. *Id.* at 23.

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, *quoting* 20 C.F.R. §§ 404.1527(a)(2). The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. § 404.1527(e)(2)(ii).

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2). However, if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and

frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. 20 C.F.R. § 404.1527(c); *see also Johnson*, 434 F.3d at 654.

In view of the foregoing authority, the undersigned addresses the opinions of the treating, examining, and non-examining medical sources.

a.   The ME's Opinion

The ALJ indicated he gave great weight to the opinion of the ME. Tr. at 98. He noted that, while the ME had never examined Plaintiff, "he testified based on his expertise in orthopedics and he considered the claimant's subjective complaints." *Id.*

The undersigned recommends a finding that the ALJ erred in according great weight to the ME's opinion. The factors set forth in 20 C.F.R. § 404.1527(c) do not support the ALJ's decision to accord great weight to the ME's opinion. The ME was an expert in the field of orthopedics, but he had no examining or treatment relationship with Plaintiff. Tr. at 8–9. As discussed above, the ME formed his opinion without the benefit of approximately three years of medical records relevant to the claim. *See* Tr. at 8. Although the ME cited specific findings in the record in his testimony, the fact that he neglected to review a significant portion of Plaintiff's records diminishes the supportability of his opinion and its consistency with the record. 20 C.F.R. § 404.1527(c). Given these factors weighing against the ME's opinion, the undersigned is unable to find that the ALJ's decision to accord it great weight was supported by substantial evidence.

b.      Dr. deHoll's Opinion

The ALJ indicated he considered Dr. deHoll's opinion, but indicated it was "done after date last insured" and "not applicable." Tr. at 98. He noted that the restrictions imposed were "not required of jobs cited by vocational expert at the hearing." *Id.*

The undersigned recommends a finding that substantial evidence did not support the ALJ's decision to discount Dr. deHoll's opinion.[8] Dr. deHoll indicated he was not "optimistic that medical intervention is going to be able to restore" Plaintiff "to the point that he can return to meaningful employment that involves significant use of upper extremities and manual tasks." Tr. at 689. Because there was an inference of linkage between the impairment to Plaintiff's bilateral upper extremities observed by Dr. deHoll and Plaintiff's pre-DLI condition, the ALJ erred in dismissing Dr. deHoll's opinion merely because it was rendered after Plaintiff's DLI. *See Bird*, 699 F.3d at 341. Dr. deHoll was an orthopedist who examined Plaintiff and his findings were supported by his treatment notes and consistent with at least some of the other evidence in the record, mitigating in favor of its acceptance under the factors set forth in 20 C.F.R. § 404.1527(c). In addition, the ALJ's conclusion that the restrictions imposed by Dr. deHoll were accommodated in the jobs identified by the VE was not supported by the record.[9] Had the ALJ accepted Dr. deHoll's opinion, a finding that Plaintiff was disabled

---

[8] Although Plaintiff generally argues "the ALJ has based his decision only on reports of those who have not personally examined or treated Mr. Cooley," he raises no specific arguments regarding Dr. deHoll's opinion. The undersigned has reviewed this opinion to determine whether substantial evidence supported the ALJ's findings.

[9] Plaintiff's attorney attempted to ask the VE about Dr. deHoll's specific statement, but the ALJ required that the attorney revise the statement to indicate functional limitations.

would have been directed based on the VE's testimony. Because this error pertains directly to the issue of disability, the undersigned finds that the ALJ's failure to properly consider Dr. deHoll's opinion was not supported by substantial evidence.

### c.    Dr. Seastrunk's Opinion

The ALJ considered Dr. Seastrunk's opinion that Plaintiff was disabled, but stated that the issue of disability was reserved for the Commissioner and was not a medical opinion under the regulations. Tr. at 98. He further indicated that Plaintiff no longer took medication and had sought no additional treatment. Tr. at 99.

Dr. Seastrunk indicated that Plaintiff was "restricted relative to overhead work above shoulder level on a permanent basis." Tr. at 615. Dr. Seastrunk further stated "this gentleman is totally disabled in so far as employment so long as he is taking narcotics on a daily basis." *Id.*

The undersigned rejects Plaintiff's argument that the ALJ discounted the opinions of Drs. Stewart and Seastrunk because they were retained by counsel in Plaintiff's workers' compensation claim. The ALJ indicated he discounted their opinions because they were inconsistent with other evidence in the record.[10] *See* Tr. at 98–99.  The undersigned finds the ALJ reasonably discounted that part of Dr. Seastrunk's opinion that

---

*See* Tr. at 32–33. The VE indicated to Plaintiff's attorney that he "would define the word significant as being at least one-third of the day." Tr. at 33. Plaintiff's attorney asked the VE "if a person was not able to use their upper extremities or perform manual tasks for one-third of the day, how would that impact their ability to perform the jobs you have stated in one, 1A, 1B and 2?" Tr. at 34. The VE testified "that would be incompatible with any type of competitive employment." *Id.*

[10] Plaintiff based his argument on language in the ALJ's 2010 decision, but only the 2012 decision is before the court for review. *See* ECF NO. 14 at 14.

indicated Plaintiff was disabled from employment because Dr. Seastrunk conditioned that statement on Plaintiff's continued use of narcotic pain medications and the record indicates that Plaintiff discontinued use of all prescribed medications. *See* Tr. at 24. However, the undersigned recommends a finding that the ALJ failed to adequately assess Dr. Seastrunk's opinion regarding Plaintiff's ability to lift overhead with his bilateral upper extremities. Although the ALJ limited Plaintiff to occasional reaching overhead with the right upper extremity, he failed to impose any overhead reaching restriction on Plaintiff's left upper extremity. *See* Tr. at 95. Dr. Seastrunk's status as an orthopedist, his examining relationship, and his objective findings provided support for his indication of impairment to Plaintiff's ability to lift overhead with his left upper extremity. The ALJ erred in failing to address that portion of his opinion. *See* 20 C.F.R. § 404.1527(c).

### d.    Dr. Keith's Opinion

The ALJ gave great weight to Dr. Keith's opinion "that the claimant is a candidate for some type of job training." Tr. at 99.

Although the ALJ provided sufficient reasons for giving great weight to Dr. Keith's opinion based on Dr. Keith's examining relationship with Plaintiff, his observations during examination, and his status as a psychologist, the ALJ failed to consider the consistency of Dr. Keith's opinion with other evidence regarding Plaintiff's mental functioning. *See* 20 C.F.R. § 404.1527(c). On remand, the undersigned recommends that Dr. Keith's opinion be reconsidered in combination with the other evidence in the record concerning Plaintiff mental impairments.

e.      Dr. Holdren's Opinion

Plaintiff argues the ALJ neglected to address Dr. Holdren's opinion that Plaintiff's depressive disorder was chronic and uncontrolled. [ECF No. 14 at 11]. However, the undersigned notes that Dr. Holdren indicated no specific functional limitations as a result of Plaintiff's depression. *See* Tr. at 520. The ALJ recognized depression as a severe impairment and imposed limitations based on Plaintiff's mental impairments. Tr. at 94, 98. In the absence of specific limitations imposed by Dr. Holdren, the undersigned finds that the ALJ adequately addressed her assessment of Plaintiff's depression as chronic and uncontrolled.

f.      Dr. Koch's Opinion

Plaintiff argues the ALJ neglected to address Dr. Koch's opinion that Plaintiff had decreased and painful ROM of his right shoulder. [ECF No. 14 at 12]. Although the ALJ did not specifically discuss Dr. Koch's assessments, the undersigned finds that the ALJ considered the ROM of Plaintiff's right shoulder in his RFC assessment. *See* Tr. at 95. Dr. Koch provided no statement that reflected judgment about the nature and severity of Plaintiff's shoulder impairment. *See* 20 C.F.R. § 404.1527(e)(2)(ii). Therefore, the undersigned recommends a finding that Dr. Koch did not provide a medical opinion and that the ALJ properly considered Dr. Koch's observations in limiting Plaintiff's use of her right shoulder for overhead work. *See* Tr. at 95.

g.      State Agency Consultants' Opinions

The factors in 20 C.F.R. § 404.1527 do not support the ALJ's reliance on the state agency consultants' opinions. As non-treating and non-examining sources, their opinions

were presumably entitled to less weight under 20 C.F.R. § 404.1527(c). Furthermore, these consultants reviewed Plaintiff's records in April, May, and August 2008, over three-and-a-half years prior to Plaintiff's DLI, and lacked the benefit of all evidence produced after May 2008. *See* Tr. at 512–19, 541–54, 558–65, 566–79. Based on the ALJ's errors in assessing the opinions of consultative and examining sources discussed above and in consideration of the factors set forth in 20 C.F.R. § 404.1527 for assessing opinion evidence, the undersigned recommends a finding that the ALJ improperly relied on the opinions of the state agency consultants.

### 5.     Workers' Compensation Order

Plaintiff argues the ALJ failed to properly consider the findings of the South Carolina Workers' Compensation Commission ("SCWCC"). [ECF No. 14 at 18]. The Commissioner argues the ALJ reasonably declined to adopt the findings of the SCWCC and adequately explained his rationale. [ECF No. 16 at 25].

The SSA is not bound by disability determinations rendered by other governmental and nongovernmental agencies.

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rule and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency (e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company) that you are disabled or blind is not binding on us.

20 C.F.R. § 404.1504. However, disability decisions rendered by other governmental and nongovernmental agencies must be considered, along with all other relevant evidence in

the case record. SSR 06-3p. The ALJ should explain the consideration given to the findings of other agencies in the notice of decision. *Id.*

On July 18, 2008, the SCWCC issued an order approving a settlement agreement between Plaintiff, his former employer, and the employer's insurance carrier. Tr. at 181–84. The parties settled the claim for $95,000, and Plaintiff agreed to be responsible for all medical expenses arising after June 2, 2008. Tr. at 182. The claim was settled on a doubtful and disputed basis as it related to Plaintiff's neck and Plaintiff did not receive an impairment rating. Tr. at 181. It was an award of total and permanent disability benefits. Tr. at 183.

The ALJ indicated he considered evidence of Plaintiff's workers' compensation settlement, but that the medical evidence, Plaintiff's daily activities, and his lack of credibility did not support a finding of disability under the SSA's rules and regulations. Tr. at 99.

The undersigned recommends a finding that the ALJ properly considered the settlement in Plaintiff's workers' compensation claim. Plaintiff cites *Bird* to argue that the ALJ was required to adopt the decision of the SCWCC unless the record clearly demonstrated that a deviation from the decision of the SCWCC was appropriate. [ECF No. 17 at 4] *citing* 699 F.3d at 340–41. The undersigned rejects Plaintiff's argument and finds this case to be distinguishable from *Bird*. In *Bird*, the ALJ failed to consider the VA rating decision because it became effective after the plaintiff's DLI. 699 F.3d at 344. However, in this case, the ALJ considered the findings in the workers' compensation settlement. *See* Tr. at 99. The court in *Bird* held that the SSA must give substantial

57

weight to a VA disability rating. 699 F.3d at 343. The court recognized that because the VA and the SSA disability programs have related purposes and evaluation methodologies, the SSA should give significant weight to the VA's disability determination. *Id.* However, the undersigned cannot reasonably find that such related purposes and evaluation methodologies exist between the SSA and the SCWCC— particularly in the context of this case. Although Plaintiff received an order from the SCWCC, this was an order approving a settlement agreement between Plaintiff, her former employer, and an insurance carrier. *See* Tr. at 181–84. The agency did not find that Plaintiff was permanently and totally disabled; it merely approved an agreement to settle the claim. Therefore, the undersigned declines to recommend *Bird* be extended to require that an ALJ give significant weight to an agency's order approving a private settlement agreement. The undersigned finds that the ALJ properly considered Plaintiff's workers' compensation order and determined the SSA was not bound by it in accordance with 20 C.F.R. § 404.1504 and SSR 06-3p.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

March 13, 2015
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).